Roe et al. vs. Doe et al.

## ROE, et al. vs. DOE, et al.

1. Land of J. C. & W. was sold at public outcry, and bid off and paid for by one S.—J. C. & W. being present and assenting to the sale, but no deed or memorandum in writing thereof was ever made to S., in execution of that sale. S. subsequently sold and conveyed the land by his own warranty deed, and as his own to one K. On the trial of ejectment brought by J. C. & W. against K. for the land: *Held,* That the sale and purchase by S. did not defeat their title, nor were they estopped by that sale; although they had previously agreed in writing, that the land should be sold, and had also appointed S. for them, and in their name as their attorney, to sell the land.

2. When S. sells land for another, and is himself, together with the attorneys of the principal, the principal purchasers of the lands at such sale, and when also, such agent and attorneys take an undue advantage or interest from such sales; *Held,* That it is no error in the Court, on the trial of suit brought for the recovery of the lands, to charge the Jury that plaintiffs were not bound by that sale if there was any fraud in it; at least, the facts would warrant this charge.

Ejectment in Laurens Superior Court. Tried before Judge HANSELL at the April Term, 1860.

This was an action of ejectment, commenced on the 19th of March, 1855, in favor of John Doe, on the demises of Eason Allen, William Oliver, and William Spell and John C. Spell, against Richard Roe, casual ejector, and Temperance Kellam, tenant in possession, for the recovery of "a tract of land, part arable, and part woodland, situated in the county of Laurens, in the settlement known as the Buckeye settlement, on the waters of Buckeye Creek, in said county, formerly known and distinguished as the Russell Kellam mill lands, and adjoining and bounded by lands formerly owned and possessed by David Culpepper, Mr. Jones, John C. Spell, David Blackshear, C. S. Guyton, John C. Culpepper and Echols Hightower, containing six hundred and eighty-one acres, more or less, and described in a deed, made by Matthew Smith, to Russell Kellam."

To this action, the defendant set up the plea of the Statute of Limitations.

At the October Term, 1857, and after one trial of the case had been had, a rule of survey, was granted by the Court, directing the premises in dispute to be surveyed by Jacob J. Linder, the County Surveyor, upon due notice to the parties, and a plat of the survey to be returned according to law.

**ESTOPPEL. "We think there is equity in the bill.** The complainant, by his deed, has whatever right Mrs. King had to this land, and we are inclined to think he can compel her, under the circumstances, to elect which of her two rights, dower or child's part, he thinks best for himself. Under the facts, as stated, those of the heirs who connived with Mrs. King and permitted her to sell to him the whole as hers, are estopped from setting up any interest in the land as against the complainant: 16 Georgia 593; 31 Ibid, 555; 50 Ibid, 722; 13 Ibid, 492; 29 Ibid, 312." Smith *v.* King, 50 Ga. 195.

On the trial of the case on the appeal, the following testimony was adduced, to wit:

### Evidence for the Plaintiff.

1. The will of William Oliver duly proven and recorded on the 9th of June, 1828, the provisions of which, are as follows:

"I give and bequeath unto my beloved wife, Abigail Oliver, two feather beds, bedsteads and furniture; one negro woman, Silvia; one grey horse, and one bay mare; four cows and yearlings; all the glass and crockery ware, kitchen furniture, two chests and two tables; also the land, mill and plantation where we now live, to be hers during her natural life, and after death, to be divided between William Spell, and John Cuddy Spell.

"I also desire and request, that all my property, real and personal, be divided between William Spell and John Cuddy Spell.

"I also desire and request, that my executors will immediately sell all my perishable property.

"I also desire and request, that my executors will dispose of my lands as they think proper for the benefit of William Spell and John Cuddy Spell, except what is bequeathed.

"I also desire and request my executors to pay and discharge all the debts due from me, and the remainder of my debts due me, to be put to the benefit of William Spell and John Cuddy Spell, they being the offspring of my wife Abigail.

"I also desire and request my wife Abigail Oliver, and my brother, McDaniel Oliver, to be my executrix and executor."

2. Sumner Adams, in answer to interrogatories, testified:

That he had been well acquainted with the woman, who was always said by her relations and acquaintances, to be the widow of William Oliver of Laurens county, deceased; her name was Abigail; after Oliver's death she married Matthew Smith; she is now dead; she died, to the best recollection of witness, in the month of August or September, 1852; she has two sons living, viz.: William Spell, and John C. Spell.

3. Two receipts, each of which were in the following words, to wit:

"Received, 5th March, 1832, from Matthew Smith, in behalf of himself and John and William Spell, seven hundred

and twenty-one dollars, the same being our portion, arising from the sale of lands in which we were entitled to the amount of one-fourth; the same being deducted from the amount of a decree in Twiggs Superior Court, wherein they were plaintiffs, and the administrator of McDaniel Oliver was defendant named.                    WILLIAM H. TORRANCE,

For himself and Richard H. Long."

4. JOHN SMITH testified: That he had known the land for twenty-five or thirty years; he knew the lines and boundaries, and showed them to Jacob T. Felder, the surveyor; the survey made by him is very near, if not exactly correct; the defendant, Mrs. Kellam, and those under whom she holds, have had peaceable possession of the land, to which he showed the lines, under a deed from Matthew Smith to Russell Kellam; Kellam went into possession at the time some twenty or thirty years ago; there are twenty or thirty acres in cultivation, which is worth for rent one dollar per acre, per annum; the land was known as the William Oliver mill tract; it is the place whereon William Oliver lived when he made his will, and on which he died; it does not lie on Buckeye creek, but on the mill creek near by, and a tributary of Buckeye creek. John C. Spell and William Spell were regarded as the children of William Oliver; they were illegitimates. William Spell was about five or six years old, and big enough to ride on horseback alone, and rode about a good deal. John C. Spell, his younger brother, was old enough to ride behind his father when they first came to the neighborhood, which was about 1811. Oliver lived there four or five years before he died, which occurred in 1811, or 1812; he knew nothing of the sale of the land by the executrix of Oliver; Spells lived in the settlement with Matthew Smith, at the time of the sale to Russell, and must have known of said sale, and must also have known of the sale by the executrix, if there was one, for they lived with Smith in the settlement, and he never heard of any objection to the sale on the part of the Spells. Witness is a brother of Matthew Smith, and lived near by him, and the two Spells, when Smith sold the land to William. The Scarborough lot is a different one from the Oliver mill lot.

5. JACOB T. FELDER testified: That he surveyed land of which the plat in Court is a representation; he knew nothing of the lines or corners, except as shown him by John Smith.

The mill is over the creek, and not on either side; he made it out two hundred and forty-seven acres; he knows nothing of it being the Oliver mill tract alluded to, except from the sayings of Smith and others; he gave to his son what he supposed was a notice of the survey, to be served on Mrs. Kellam, but does not know whether it was served or not; suppose that the copy notice was not signed, as the original was not. On the day of the survey he went by Mrs. Kellam's, and she spoke as if she were looking for witness and expecting the survey. I asked her for her title papers, and she said the surveyors had them; he asked her son Seth in her presence to go with him on the survey, but he declined on the ground of other engagements. Mrs. Kellam did not object to the survey being made, and her son in her presence signified his anxiety for the survey to be made, in order that the lawsuit might end. Mrs. Kellam's son Seth was living with her and attending to her business; the land that witness surveyed, was not on Buckeye creek, but on Kellam's mill creek, a tributary of Buckeye; it adjoins lands of C. S. Guyton, Mrs. Kellam, and Hamilton Smith; there are about thirty acres in cultivation, and worth for rent one dollar per acre, per annum.

6. WILLIAM H. MARTIN testified: That Temperance Kellam was in possession of the land in dispute, at the date of the service of the writ, viz.: March 21, 1855; that she had been in possession, cultivating it, since 1862; that she is still in possession; that there are twenty or twenty-five acres cleared which are worth for rent per annum, one dollar per acre.

*Evidence for the Defendant.*

1. The following agreement, to wit:

GEORGIA, LAURENS COUNTY:

This memorandum of an agreement between William Spell, John Cuddy Spell, and William Smith, in right of his wife, Abigail Smith, late Abigail Oliver, heirs and legal devisees of William Oliver, deceased, of the one part, and Abigail Oliver, executrix of the will of said William Oliver, witnesseth: That for the purpose of hastening the division of said estate, and to save the expenses usually attendant on the proceedings in dividing estates, or of obtaining an order of sale, the parties of the first part do by these presents agree, that the said executrix shall proceed to sell all the real estate of the

deceased, so soon as may be practicable, in such manner as shall be most consistent with the interest of said estate, ratifying and confirming the acts and deeds of the said executrix in the premises, as fully as may be in our power as devisees of said estate.

Signed, sealed and delivered this the 21st October, 1828, in the presence of Daniel Culpepper.

his  
WILLIAM X SPELL, [L. s.]  
mark  

his  
JOHN C. X SPELL.  
mark  

MATTHEW SMITH.

On the back of said agreement was written the affidavit of Daniel Culpepper verifying its execution, which affidavit was dated the 4th of February, 1829.

On the back of the agreement was also written the following, to wit:

"I consent to the agreement within so far as I am interested in the land, upon the receipt of one-fourth part of the proceeds of the sale of said land."

"October 24, 1828."

RICHARD H. LONG, [L. s.]

2. The following written memorandum, or statement, to-wit:

GEORGIA, Laurens County:

March 1, 1828, received of Matthew Smith, William Spell, and John C. Spell, a deed of indenture for one-fourth part of the lands belonging to the estate of William Oliver, deceased, as a fee for services to be rendered in the recovery of the lands of said estate. If the lands are not recovered, I have no right to hold or claim upon them for any remuneration for such services rendered; but my right to fee is dependent upon the recovery of the lands.

| | |
|---|---:|
| R. H. Long, of Laurens | 432 |
| Matthew Smith | 643 |
| John Spell | 810 |
| Long & Lawrence Morgan | 1,000 |
| Dunbury tract | 400 |
| | 3,285 |

| | | |
|---|---|---|
| Long & Lawrence interest................82—125 | | |
| Amount purchased by Long & Lawrence........ | 1,432 | 00 |
| Cash received by long........................ | 26 | 00 |
| | 1,458 | 00 |
| | 821 | 25 |
| | 636 | 75 |
| Smith and Spell's note to R. H. Long.......... | 157 | 25 |
| | 479 | 50 |
| | 29 | 56 |
| | 449 | 93 |
| Credit by R. H. Long........................ | 72 | 23 |
| | 377 | 70 |

3d. Richard H. Long, in answer to interrogatories testified:

That the foregoing agreement was written by him, and signed by William Spell, John Spell and Matthew Smith, in his presence, and that the consent written on the back of the agreement was written and signed by the witness; that, pending the negotiations relative to the agreements and the subject-matter of them, the witness was particular in making inquiry as to the ages of the two Spells, and especially of John C. Spell, and was answered by them and their mother, in positive terms, that they were both of age. John C. Spell (his brother William being present) was the first to consult with witness in the case that led to the arrangement stated in the agreement, and he stated to witness, that his uncle, McDaniel Oliver, was endeavoring to cheat them out of their land. Witness then told them, and afterwards again told them, and Matthew Smith, that their claim to the land could not be sustained, unless there was a will of William Oliver to sustain it. To this, Smith replied, that he believed there was a will. A few days afterwards, witness visited Mrs. Smith, wife of Matthew Smith, and mother of the two Spells, at her request, and also, at her request, examined some papers, among which was a will—this was handed to witness. In all the transactions, both before and after the agreement was signed, the Spells were prominent, especially John C. Spell, who was the most intelligent. So far as witness knows,

they never disputed the genuineness of the agrement; but, on the contrary, acknowledged its validity, and acted under it. Both gave powers of attorney to Smith, to sell the lands in furtherance of the agreement; and when Smith wanted to take the mill place, at a valuation to be fixed by two disinterested valuing agents, John C. Spell objected, saying that he wanted the land sold at public sale, because persons who wanted it, would give more for it than it would be valued at. The Spells were present at the sale of the lands in Laurens, and each of them bid at the sale. William Spell bid for one tract only, but John C. Spell bid for each tract, and was the purchaser of one. The lands sold under the agreement in Laurens county, were the mill tract—then known as the Matthew Smith mill tract—the Scarborough tract, the Vicker's or Brazille tract. When the mill tract was put up, Mrs. Smith said she was entitled to that during her life; but John C. Spell desired it sold at once; and witness, on being asked, gave it as his opinion that John C. Spell's proposition was a fair one; as all were let into an equal interest in the land under the agreement, it was just that the Spells should receive their part of the mill tract at once. This was agreed to—Mr. and Mrs. Smith both saying that it was right. The sale was not objected to by either of the Spells, but both of them said to the witness, then and afterwards, that they were satisfied. The memorandum or statement aforesaid, dated 1st March, 1828, was written and signed by the witness. The deed therein mentioned was a conditional deed, and was given to William H. Torrance, Esq., to settle with Smith and the Spells; since which, the witness has not seen it, and does not know where it is. The other statement in writing and figures was written by the witness and handed to Torrance, also to be used in the settlement with Smith and the Spells. The entry of "R. H. Long, 432," was to show that the land, to wit: the Vickers place, bought by witness at the sale, was bid off by witness at $432. The entry, "Matthew Smith, 643," was to show that the mill tract was bid off by him at $643. The entry of "John C. Spell, 810," was to show that he bid off the Scarborough place at $810. The same may be said of the other entries. As to the settlement with Smith and the two Spells, it was made by Col. Torrance, counsel, and not by witness. Witness will not be gainer or loser by the event of this suit. He can not give the boundaries of the land, though he knew it well twenty-five or thirty years ago.

4th. A power of attorney, dated 4th of February, 1829, made and executed by John C. Spell, empowering Matthew Smith to sell and convey the part of said John C. Spell in the lands belonging to the estate of William Oliver, deceased, as well as all interest belonging to said Spell in such lands, under the will of the said deceased.

5th. A similar power of Attorney, dated the 2d of February, 1829, from William Spell to Matthew Smith, for a similar purpose.

6th. A deed from Matthew Smith to Russell Kellam, dated the 4th of July, 1834, and recorded the 11th of August, 1834, conveying "six hundred and eighty-one acres of land lying in Laurens county, adjoining lands of David Culpepper, John Livingston, Mr. Jones, John C. Spell, David Blackshear, C. S. Guyton, John C. Culpepper and Echols Hightower, it being part of 500 acres granted to William Blount, by Governor Matthews, on the 16th of February, 1787, and part of 287½ acres granted to William Carroll, by Governor Houston, on the 16th of September, 1788; and also, part of a tract of land granted to Reuben Wilkinson, by Governor Handly, of the 28th of May, 1788, all lying on the waters of the Buckeye creek."

7th. A deed from John C. Spell to Russell Kellam, dated the 2d day of January, 1836, and recorded the 6th of March, 1844, conveying "certain tracts of land, lying on Buckeye creek, and the waters thereof, in the county of Laurens, containing four hundred acres, more or less; one tract of 300 acres, granted to William Scarborough, by Governor Telfair, on the 22d of February, 1785; also, one hundred acres granted to said Scarborough, by Governor Milledge, on the 26th of August, 1805."

Upon this testimony, the jury returned the following verdict, to wit:

"We, the jury, find, for the plaintiff, the premises in dispute—that is to say, two hundred and forty-seven acres, more or less, according to the rule of survey to us submitted—being a tract of land situated in Laurens county, on Kellam's Mill creek, a tributary to Buckeye creek; beginning at Guyton's corner, on the James Perry Branch, running south 61°, west 71 chains, crossing the Darien road, near Cincinnatus S. Guyton's house, to a stake corner; thence, north 29°, west 54 chains, crossing said Mill creek, to the head of a

branch near the old place of residence of the plaintiff, John C. Spell; thence, north 61°, east 71 chains, crossing the said Darien road near the defendant's house, to an old road; thence, south 29°, east to the main prong of said Mill creek; thence, down the meanderings of said creek to the high-water mark of the mill pond on the same; thence, up the meandering of the said James Perry Branch, to the beginning point. We further find, for plaintiff, two hundred and twenty-five dollars for mesne profits, with cost of suit."

Counsel for defendant then moved for a new trial of said case, on the following grounds:

1. Because the jury found contrary to law and the charge of the Court, as to the assent of the plaintiffs to the sale of the land.

2. Because the jury found contrary to the evidence and the weight of the evidence in the case.

3. Because, whilst the Court was right in charging the jury, "that if the two Spells were present, agreeing to a public sale of the lands in dispute, bidding for it, and encouraging others to bid for it, and setting up no claim to it at the sale, nor objecting to the sale, they were bound by that sale, and could not recover the land," he erred in adding, "unless there was fraud in the sale," as there was no evidence, either direct or circumstantial, of any such fraud. And when the Court had so charged, counsel for defendant requested the Court further to charge the jury, "that fraud could not be presumed, but must be proven," which was done; but the Court again erred in adding: "But that fraud might be proven by circumstances, as well as by positive evidence; and that, in looking into the case, the jury might connect all the facts and circumstances together, as well as the relationship, to determine if the sale was a fair and *bona fide* transaction," as there were no circumstances in the case from which the jury could reasonably infer fraud in the sale of the land to which their minds were thus directed by the charge.

The presiding Judge overruled the motion, and refused the new trial, and this decision is the error alleged in this case.

WARREN & GOODE, for plaintiff in error.

JOHN R. COCHRAN, for defendant in error.

*By the Court.*—LYON, J., delivering the opinion.

This was an action of ejectment in Laurens Superior Court, for the recovery of a tract of land, known, originally, as the Oliver Mill tract, in which John C. and William Spell were plaintiffs, and Temperance Kellam, widow of Russell Kellam, deceased, was defendant.

The land in controversy belonged, originally, to William Oliver, and was, by him, by his last will, devised to his widow, Abigail, during her life, and, at her death, to his two sons, John C. and William Spell. The testator, Oliver, executed this will in the year 1811, and died soon after. His widow intermarried with Matthew Smith, and died in 1852. The will was not produced, or admitted to probate, until the year 1828, after the marriage of testator's widow with Matthew Smith. Upon this, the plaintiffs rested their right to a recovery of the premises.

The defendant relies on the following facts to defeat their right: that this tract was sold at public outcry, in the county of Laurens, and bought, at that sale, by Matthew Smith; that the plaintiffs were present at that sale, and not only did not object thereto, but assented, by bidding for the land, participating in the sale, and receiving the benefit thereof; that all the balance of the land of the testator, Oliver, in that county, Laurens, was sold at the same time—plaintiffs being also present, bidding on all and buying one of the tracts; that they then were of age; had previously agreed, in writing, that the executrix should sell the land in that way; that each of them, one on the 2d and the other on the 4th of February, 1829, appointed Matthew Smith, attorney in fact for them, and, in their name, to sell their interest in these lands; that Matthew Smith bid off this tract at $432, and complied with the terms of sale so far as to account for that sum in the division of the proceeds of sale, under the agreement, which seems to have been that the lands the plaintiffs became entitled to, under the will of Oliver, should all be sold, and the proceeds divided into four parts, one to the lawyers, one to Matthew Smith, and one to each of the plaintiffs. The reasons for this extraordinarily liberal agreement on the part of the plaintiffs do not appear. The only interest that Matthew Smith had was the life interest of his wife in one of the tracts; and, by this agreement, if it could be enforced,

he not only retained that interest, but would get the entire fee, and as much money as the fee simple of the tract brought at the sale.

This sale, together with its terms and circumstances, are proven by Richard H. Long, one of the attorneys who received one-fourth part of the proceeds of the sale. There was no deed executed for the lands so sold to the purchasers at that sale, nor any memorandum thereof signed by the party making the same. The evidence does not show when the sale was had, but the indications are, that it must have taken place in the year 1828, or 1829—most likely in 1829, after the execution of the letters of attorney from the plaintiffs to Matthew Smith. In 1834, Matthew Smith sold and conveyed this tract of land to Russell Kellam, under whom the defendant claims.

Upon these facts, counsel for defendant insists, that the sale and purchase, by Matthew Smith, in 1828, or 1829, testified to by the witness, Long, divested the plaintiffs of the title thus acquired under the will of Oliver—or rather, that, as they were present at that sale, assented to it, bid for the land, and received the benefit of it, they are estopped from setting up their title against such sale.

The Court below, in charging the jury, gave the defendant the benefit of this principle; but counsel insists, that the qualification made, to wit: "that the plaintiffs were bound by that sale, unless there was fraud in the sale," was erroneous, because there was no evidence of any fraud; and that is the error complained of. We propose, first, to inquire, whether the plaintiffs were estopped, by that sale, from asserting their title to the land against the defendant? And, secondly, whether the qualification made by the Court, as to the fraud in the sale, was justified by the evidence?

1. Were the plaintiffs estopped or bound by the sale? We are clear that they were not. The insurmountable difficulty to the application of that principle, under the facts, is, that whatever, in fact, was agreed to be done, or was done, there was no deed made, or any memorandum in writing, of the sale, by anybody, as evidence that there was a sale, by which the plaintiffs could be estopped or barred of their title to these lands. The plaintiffs agreed, in writing, on the 21st of October, 1828, that the executrix should proceed to sell all the real estate of the deceased. It does not appear that she

ever done so. They subsequently appointed Matthew Smith their attorney, with power to sell their interest in all the lands, for them, in their name, and to make their title. It does not appear that he ever did so. Had he, there would have been no difficulty. The reliance is on a public sale, on a sale day, at which the plaintiffs were present, bid and got the benefit of the sale, and at which Matthew Smith bought this land; but by whom the sale was conducted, or the particular time it took place, is left to conjecture. Now, if a title had been made by the person who conducted that sale, no matter who that was to the purchaser, these plaintiffs being present, assenting to, and participating in, that sale, then, they would have been bound thereby—they would have been estopped, but this was not done; and to say that a title to lands can be created or passed in this way, is to run directly in the teeth of the statute of frauds. Matthew Smith was the purchaser, and the defendant has his title, stands in his place, and is in no better condition than if the contest was between plaintiff and Smith. Now, suppose the contest was with Smith, under these facts, in what better condition would he be, if the plaintiffs had agreed, directly, to sell him the land at $532, and this sum was paid into their hands, no title or deed of any kind being made, or the contract reduced to writing? This would be equally as strong a case, if not stronger; yet, it would not pass the title. The plaintiffs would not be bound by it. It could not be enforced, even in equity, and why? For the simple reason that the contract was not in writing. What is the difference between this case and that? Does not the defendant have to depend upon the recollections of witness, after the lapse of more than thirty years, to prove not only that the plaintiffs were present, participating in, and assenting, but there was, in fact, a sale, and that the terms were all complied with. These are things that the statute intended to provide against, and, we think, effectually so.

It is not pretended that the deed made by Smith, in 1834, to Kellam, was in execution of the powers of attorney. Those powers can not aid the defendant's title, for the reason that the deed does not purport to be made in execution thereof. Nor is it pretended that Kellam bought from Smith, or was induced to do so upon the representations or acts of the plaintiffs, that the title was in him. If that was true, the case would be very different, for then the principle would ap-

ply, which is contended for by the defendant; but it is not so, for we looked carefully and anxiously into the record for some evidence of that fact, and we could find nothing to warrant the conclusion. We are forced to conclude that the plaintiffs were not estopped or bound by the sale, if one was ever made.

2. Suppose, however, that we should be mistaken in this view, still the defendant has not been injured, for the Court below, taking a different view to ourselves, gave her the benefit of the principle for which she contends, subject to the qualification that the plaintiffs were not bound by the sale, if there was any fraud in it. And we think that the facts not only authorized, but required that charge. The executrix of the will suppressed the existence of such a paper from the knowledge of these plaintiffs from 1811 to 1828, and until the lands were involved in litigation, her title disputed, and about, perhaps, to be lost, for the want of a will. When it is produced, a ruinous and unjust agreement is made with them, by which they are deprived of one-half their lands, without any consideration or corresponding benefit to them. Those persons who stood in a confidential relation towards them, such as Matthew Smith and his wife, representing the will, and the counsel of these plaintiffs, whose duty it was to look after and protect the interest of these plaintiffs, were themselves the principal purchasers of the lands, when, legally, they could not buy, because, by becoming bidders, themselves, their interest, as purchasers, to get the lands as low as they possibly could, conflicted with their duties to their clients to make the land sell for as much as it was worth. Surely, if a sale so made was not open to the inquiry of fraud, on the facts stated, it would be difficult to find one that was. In no view that we can look at this case, can we see any reason for disturbing the verdict of the jury.

## JUDGMENT.

Therefore, it is considered and adjudged by the Court, that the judgment of the Court below be affirmed.